IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| JERROD LAMONT BENSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| WARDEN, *et al.*, | ) |
| | ) |
| Respondents. | ) |
| | ) |

Civil Action No.: 1:22-cv-2953-LKG

Dated: July 30, 2025

USDC- GREENBELT
'25 JUL 30 PM 2:15

## MEMORANDUM OPINION

Represented Petitioner Jerrod Lamont Benson filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his 2014 conviction in the Circuit Court for Charles County, Maryland for attempted first-degree murder and related crimes. ECF No. 1, 5. Respondents filed an Answer arguing Benson's claims lack merit. ECF No. 10. For the reasons that follow, the Petition shall be **DENIED**, and a certificate of appealability shall not issue.

### I.    BACKGROUND

#### A. Trial

On September 14, 2012, Benson was indicted in the Circuit Court for Charles County on nine counts, including attempted first-degree murder and related crimes. ECF No. 10-1 at 8, 12. After a trial by jury held on April 22 through April 24, 2014 (ECF No. 10-5, 10-6), Benson was found guilty of attempted first-degree murder, attempted second-degree murder, conspiracy to commit murder, first-degree assault, conspiracy to commit first-degree assault, theft, and unauthorized removal of property. ECF No. 10-7 at 4-5.

According to the Appellate Court of Maryland,[1] the following facts were adduced at trial:

> For twenty years, John Bergling worked for the Washington Post delivering newspapers. In the early morning hours of August 5, 2012, he drove his minivan full of newspapers to Ryon Court in Leonardtown. At one point, Bergling got out of his van to deliver some of the newspapers. When he finished delivering the newspapers and was heading back to his van, he heard someone run up behind him.

---

[1] Formerly known as the Maryland Court of Special Appeals.

When he turned to look, he saw a young man in his late teens or early twenties, whom he identified at trial as Derrick Thompson.

Thompson asked Bergling what he was doing, and Bergling responded that he was "serving newspapers." As Bergling continued to walk toward his van, Thompson punched him in the back of his head, causing him to fall forward on his knees. Bergling pivoted toward Thompson but was kicked in the face and under his chin.

Before Bergling could stand up, he heard "running coming up from [his] left." He was then attacked by a group of seven men who "tackled" him to the ground. Bergling identified one of the men who tackled him as Gregory Boseman.

The men smashed Bergling's face into the pavement and went through his pockets. One of the men demanded that Bergling give him his wallet, but when Bergling said he did not have a wallet, the man punched him in the face. The man demanded Bergling's cell phone, and Bergling responded that it was in his van. Thereafter, Bergling saw someone going through his van.

The men continued to beat Bergling. At one point, Bergling freed his left hand from beneath his body and flung it up to protect the back of his head. He heard one of the men say, "Oh, lookey, what do we have here?" After threatening to cut off Bergling's finger, the men took his wedding band. Then, after beating him for about five minutes, the men stopped, stripped off Bergling's clothes, and ran away. Someone drove off in Bergling's van.

Bergling tried to make his way to a police station on Leonardtown Road, but before he got there, a group of men ran up behind him and started punching him again. Bergling stayed on his feet and the men eventually ran away.

Again, Bergling tried to reach the police station, but a group of men attacked him for a third time. They beat him until he "went blind." The men ran off, and Bergling was able to crawl toward the police station.

When Bergling reached a fence near the main entrance of the Ryon Woods neighborhood, he "got down on [his] belly" and stayed there for about fifteen minutes, "until [his] vision came back." While lying on the ground in the weeds near the fence, Bergling heard voices looking for him and then heard someone yell, "Let's get out of here." Bergling heard them run away.

Shortly thereafter, Bergling made his way to the police station, where Charles County Sheriff's Officer and Emergency Medical Technician Richard Bagley covered him in an emergency blanket and attended to his injuries. According to Bagley, Bergling had "severe facial and head trauma" and "was bleeding profusely from his face."

Bergling was taken to the hospital by ambulance. He suffered from two broken ribs, a broken nose, damage to his hearing, numerous contusions and abrasions, posttraumatic stress disorder, and a cornea laceration that required surgery. He also required plastic surgery near his eyes. The police later recovered Bergling's van parked on the side of a road about two hundred yards from the entrance to the Ryon Woods neighborhood. Bergling's reading glasses and cell phone and a utility knife were missing from it.

Officer Stephen Duley and Detective Brion Buchanan of the Charles County Sheriff's Office assisted in the investigation of the robbery and beating of Bergling. Officer Duley located some newspapers, a t-shirt, and a pair of socks in an area near Ryon Court. Detective Buchanan recovered a box cutter, a pair of gray sweatpants, white underwear, and a pair of brown boots.

Just before 3:00 a.m., as Officer Duley was taking photographs of the area where the crime occurred, he observed a group of three men walking down the street. Officer Duley asked if he could photograph them, and the men agreed. Officer Duley identified one of those men as Andrew Washam and another as Benson. Benson was wearing a white t-shirt with an image of a wrestling belt on the front.

Washam testified that sometime between 11 p.m. and midnight on August 5, 2012, Gregory Boseman called and asked if he wanted to go to a party in the Ryon Woods neighborhood. Washam agreed to go to the party. He drove to Boseman's house and picked up Boseman, Benson, Derrick Thompson, and Kenneth Brawner. They went to a playground in the Ryon Woods neighborhood and began socializing, drinking, and smoking marijuana with a group of other people. Washam said that he drank two or three shots of vodka and smoked marijuana.

Sometime later, Washam, Benson, Thompson, and two young women, one of whom was named Jasmine, drove to a nearby 7-11 store and purchased some snacks, a pack of cigarettes, and a drink. The group then returned to the playground and continued to smoke and drink for about a half hour, until the police "showed up" and said they "had to leave the playground." As Washam was walking away from the playground, he said that he noticed a commotion at the end of the street.

Washam approached the commotion and was "shocked to see it was a guy on the ground." According to Washam, Benson, Boseman, Thompson, and a couple of other guys were there, and "[s]omebody was talking about robbin' [the man on the ground and] taking his belongings." About five feet away from the man on the ground, Washam saw a minivan with the keys in the ignition and the engine running. Referring to the man on the ground, Benson said, "[r]un him the fuck over." Washam testified that he did not want the man to be run over, so he got into the minivan and drove it out to the main road adjacent to the Ryon Woods neighborhood. Washam then walked back to his own car, which was parked in Ryon Woods.

3

As he was getting in his car, Benson, Boseman, Thompson, and Brawner came running toward him and got into the car. They drove out of the Ryon Woods neighborhood and went to Washam's home. As they were driving, Benson, Boseman, and Thompson were talking "about how tough they were," how they had "smashed the guy's cell phone," and about "what they had gotten from the guy." They discussed how much the man's ring was worth and bragged about what they had done.

Washam, Benson, Boseman, Thompson, and Brawner walked from Washam's home back to the 7-11 near Ryon Woods. Thereafter, they all walked back to Ryon Woods, where they were stopped by police officers who took their photographs. Washam testified that he did not tell the police officers that he knew anything about the assault that occurred earlier because he was "too intoxicated to really make any good decisions at that time." After encountering the police, Washam went home.

On the night of the assault, Jasmine Lownes was at a restaurant with twenty to twenty-five other people celebrating the birthday of her friend Sharleah Queen. After the dinner, everyone returned to the Ryon Woods neighborhood, where Queen lived, and went to a park across the street from Queen's house to hang out. At some point, three "guys" showed up at the park, one of whom was wearing a shirt like the one Benson was later photographed as wearing. Lownes and Queen went with them to a nearby 7-11 store, where they purchased snacks and took photographs. They then returned to the park and hung out until police came and dispersed the group.

After leaving the park, Lownes went to Queen's house. While in Queen's upstairs bedroom, Lownes heard Queen enter the front door of the house yelling, "[t]hose three dudes just beat up some old mailman." Lownes went downstairs and saw that Queen was "really shocked, like she had just seen something really bad," and she was "panicking a little bit."

Queen's sister, Raynette King, had also been at the park in the Ryon Woods neighborhood. At some point, King left the park with her friend, Mike, and went to a McDonald's restaurant. As King and Mike were returning to the park, they saw a man in his underwear crawling on the ground while two men kicked him. King saw two other men running away from the scene. One of the men who was kicking the man on the ground met Benson's description – he wore a white shirt and had dreadlocks. King testified that she just "[k]ept walking" and did not call for help.

Charles County Sheriff's Detective Jack Austin spoke to Washam on August 16, 2012. Washam told him that Benson, Boseman, and another person known as "Little Head" were involved in the beating of Bergling.

ECF No. 10-1 at 143-148. On July 3, 2014, the trial court sentenced Benson to two concurrent sentences of eighty years' imprisonment. ECF No. 10-8 at 32-34.

**B. Direct Appeal**

Benson appealed his conviction to the Appellate Court of Maryland. ECF No. 10-1 at 18.

He asserted four assignments of error:

> (1) The pre-trial hearing court erred by ruling that "bad acts" evidence was admissible.
>
> (2) The trial court erred by admitting the hearsay statement of Sharleah Queen during the testimony of Jasmine Lownes.
>
> (3) The evidence is insufficient to sustain [Benson's] convictions for attempted murder in the first and second degrees and conspiracy to commit assault in the first degree.
>
> (4) The trial court erred by departing from agreed-upon jury instructions while defining accomplice liability.

*Id.* at 25. The Appellate Court of Maryland issued an opinion on November 18, 2015, affirming his conviction. Benson sought further review with the Supreme Court of Maryland,[2] which denied his petition for a writ of certiorari on April 25, 2016. *Id.* at 162-183.

**C. Petition for Postconviction Relief**

Benson filed a petition for postconviction relief with the circuit court on January 10, 2017, which was later amended by counsel. ECF No. 10-1 at 184-223. He asserted nine claims:

> Trial counsel rendered ineffective assistance by:
>
> (1) not impeaching Andrew Washam with his earlier testimony showing that he was not, in fact, confident that it was Mr. Benson who proposed running Mr. Bergling over;
>
> (2) not objecting when the State elicited hearsay from Det. Austin about what Andrew Washam had supposedly told him (namely, Mr. Benson's alleged "I got your back" comment);
>
> (3) not objecting and seeking a curative instruction when the State in closing mis-defined premeditation;
>
> (4) not objecting when the trial court emphasized the accomplice liability instruction by giving the jury a written copy of that instruction;
>
> (5) not impeaching Raynette King with prior inconsistent statements showing that she had not been honest with the police;

---

[2] Formerly known as the Maryland Court of Appeals.

(6) not objecting when the State vouched for its case in its rebuttal argument;

(7) not moving for judgment of acquittal on count 9 (unlawful removal of Mr. Bergling's van), or in the alternative, by not objecting to an incomplete oral instruction on this count;

(8) not consulting with Mr. Benson about and then not filing an application for review of sentence;

(9) not filing a timely motion for modification of sentence.

ECF No. 10-1 at 190-191, 315-317. The postconviction court held a hearing on December 3, 2018, where Benson and his trial counsel, Kimberly Righter, testified. ECF No. 10-9. On November 25, 2020, the postconviction court issued a written opinion. *Id.* at 329-335. The postconviction court granted Benson leave to file an out of time motion for modification of sentence but denied all other claims. *Id.* at 329-336. The postconviction court reasoned that Benson waived all his ineffective assistance of counsel claims by failing to raise them on direct appeal. *Id.*

Benson filed a motion for modification of sentence on February 22, 2021. *Id.* at 354-372. Benson argued that he was serving a "draconian" sentence that amounted to life without parole[3] and, *inter alia*, his sentence was disparate from his co-defendants. *Id.* at 359-360. Benson mentions the cooperating co-defendant, who was sentenced to eighteen months, a co-defendant that plead guilty and sentenced to twenty-five years, and another co-defendant who went to trial and was sentenced to twenty-five years. *Id.* The circuit court summarily denied Benson's motion on March 23, 2021. *Id.* at 375.

Benson filed a motion for leave to appeal his denied claims with the Appellate Court of Maryland. *Id.* at 337-353. The state filed a response, agreeing that the postconviction court's order was contrary to well-established Maryland precedent that ineffective assistance of counsel claims should be raised in postconviction. *Id.* at 376-390. On June 30, 2021, the Appellate Court of Maryland vacated the postconviction court's opinion and remanded the matter for disposition on the merits. *Id.* at 391-394.

---

[3] Benson received additional time in separate matters, totaling one hundred seven years and one day. ECF No. 10-1 at 354-356.

On remand, the postconviction court issued a written opinion dismissing all of Benson's remaining claims. *Id.* at 418-431. Benson filed a motion for leave to appeal to the Appellate Court of Maryland, which summarily denied his motion on August 29, 2022. *Id.* at 432-465.

**D. Federal Habeas Petition**

Benson filed his federal petition for habeas corpus relief, pro se, on November 10, 2022. ECF No. 1. Counsel was subsequently appointed, and an Amended Petition was filed. ECF No. 5. Benson raises two claims for relief:

> (1) Petitioner's trial counsel deprived petitioner of the effective assistance of counsel during trial. Counsel performed deficiently in three main ways: (1) counsel failed to object to Detective Austin's testimony on redirect examination that Andrew Washam told Adams that petitioner had "encouraged" Derrick Thompson by saying, "I got your back," after the latter yelled "run him over" to the group of men who were assaulting John Bergling; (2) counsel failed to cross-examine Washam about his prior, less confident testimony at Derrick Thompson's trial; and (3) counsel failed to object to two improper arguments made by the prosecutor in his closing argument that increased the odds of Petitioner's conviction for attempted first-degree murder and conspiracy to commit first-degree murder. (ECF No. 5 at 28).
>
> (2) Petitioner's Trial Counsel Deprived Petitioner of the Effective Assistance of Counsel by Misadvising Him about the Potential Negative Consequences of Seeking Review of His 80- Year Prison Sentences by a Three-Judge Panel. (ECF No. 5 at 1).

Respondents filed an Answer on April 4, 2023, arguing that Benson's claims should be dismissed because they lack merit or are non-cognizable. ECF No. 5. Benson filed a Reply on April 23, 2023. ECF No. 11.

**II.     STANDARD OF REVIEW**

In analyzing Benson's petition for a writ of habeas corpus, the Court is bound by the standard of review for the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The Court may grant the writ on a claim adjudicated on the merits in a state court proceeding only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or involved an "unreasonable application of such law," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1); 28 U.S.C. § 2254(d)(1)(2); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor*, 529 U.S. 362, 379 (2000).

In assessing a petitioner's habeas claims, the district court looks to the opinion of "the last reasoned decision of a state court addressing the claim." *Allen v. Stephan*, 42 F.4th 223, 247 (4th Cir. 2022) (quoting *Woodfolk v. Maynard*, 857 F.3d 531, 544 (4th Cir. 2017)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 364–365. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 407.

In other words, to obtain relief on his petition, Benson must identify the "clearly established" legal principle on which he relies. To qualify as "clearly established," a principle must originate from an actual Supreme Court holding, not from its passing dicta. *See White v. Woodall*, 572 U.S. 415, 419 (2014). Benson also must describe this holding with specificity. *See Brown v. Davenport*, 596 U.S. 118 (2022). He cannot recite a holding at a "high level of generality." *Lopez v. Smith*, 574 U.S. 1, 6–8 (2014) (per curiam) (citation omitted); *Metrish v. Lancaster*, 569 U.S. 351, 367–68 (2013). Circuit precedent cannot turn "a general principle of Supreme Court jurisprudence into a specific legal rule" that has not been stated by the Supreme Court. *Lopez*, 574 U.S. at 7 (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)).

If relying on the "unreasonable application" clause, Benson next must show that the state court engaged in an "unreasonable application" of clearly established law. Under this test, a federal court's belief that a state court committed an error when applying a legal principle to the facts of a case does not suffice. Rather, the federal district court must be able to describe the state court's application as "objectively unreasonable[.]" *White*, 572 U.S. at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). To warrant that description, a state court must have committed "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Benson faces an additional hurdle if he alleges a trial court error that the state court subjected to harmless error review. Under these circumstances, a federal court cannot grant habeas relief without applying both the test outlined in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and the deferential review required by AEDPA. *Brown*, 596 U.S. 118. *Brecht* requires a

state prisoner seeking to challenge his conviction in collateral federal proceedings to show that the error had a "substantial and injurious effect or influence" on the outcome of his trial. 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A "substantial or injurious effect or influence" means "actual prejudice." *See id.* at 637–38. A "federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 134. To succeed on any of his trial error claims, Benson must convince this federal habeas court that there is grave doubt about his verdict *and* demonstrate that every fairminded jurist would agree that the error was prejudicial. *Id.* at 1525.

      As discussed in detail below, these standards foreclose Benson's claims.

## III.    DISCUSSION

      Benson's grounds for relief are premised on ineffective assistance of counsel. The Sixth Amendment to the Constitution guarantees a criminal defendant the right to effective assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 580 U.S. 100, 118 (2017); *United Staters v. Ductan*, 800 F.3d 642, 648 (4th Cir. 2015). To mount a successful challenge based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687-88; *see Williams (Terry)*, 529 U.S. at 390; *United States v. Sutherland*, 103 F.4th 200, 207-08 (4th Cir. 2024); *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Hall*, 771 F. App'x 226, 227 (4th Cir. 2019) (per curiam); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017).

      First, the petitioner must show that counsel's performance was deficient.  Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 580 U.S. at 118; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229.  The petitioner must prove his claim by a preponderance of the evidence. *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021) (4th Cir. 2021; *United States v. Pettiford*, 612 F.3d 270, 277 (2010).

      With regard to the first prong, the petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Harrington*, 562 U.S. at 104; *Sutherland*,

103 F.4th at 207–08; *United States v. Richardson*, 820 F. App'x 225, 225 (4th Cir. 2020);
*Powell*, 850 F.3d at 149; *Hall*, 771 F. App'x at 227.  The central question is whether "an
attorney's representation amounted to incompetence under 'prevailing professional norms,' not
whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 88
(quoting *Strickland*, 466 U.S. at 690).

> The Supreme Court recently reiterated that the "first prong sets a high bar." *Buck*, 580
U.S. at 118.  Notably, a "lawyer has discharged his constitutional responsibility so long as his
decisions fall within the 'wide range of professionally competent assistance.'" *Id.* (citation
omitted).  The standard for assessing such competence is "highly deferential" and has a "strong
presumption that counsel's conduct falls within a wide range of reasonable professional
assistance." *Strickland*, 466 U.S. at 669.  Judicial scrutiny of counsel's performance must be
"'highly deferential'" and not based on hindsight. *Stokes v. Stirling*, 10 F.4th 236, 246 (4th Cir.
2021) (citing *Strickland*, 466 U.S. at 689).

> To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made
errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth
Amendment.'" *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687).  Notably, "the
*Strickland* standard must be applied with scrupulous care," because "the standard of judging
counsel's representation is a most deferential one." *Harrington*, 562 U.S. at 105; *see United
States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019).  Indeed, "[k]eenly aware of the difficulties
inherent in evaluating counsel's performance, the Supreme Court has admonished that courts
'must indulge a strong presumption that counsel's conduct falls within the wide range of
reasonable professional assistance.'" *Lawrence v. Branker*, 517 F.3d 700, 708 (4th Cir. 2008)
(quoting *Strickland*, 466 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011);
*Harrington*, 562 U.S. at 104; *Richardson*, 820 F. App'x at 225-26; *Lee v. Clarke*, 781 F.3d 114,
122 (4th Cir. 2015).  Therefore, "[j]udicial scrutiny of counsel's performance must be highly
deferential." *Strickland*, 466 U.S. at 689.

> Second, the petitioner must show that his attorney's deficient performance "prejudiced
[his] defense." *Strickland*, 466 U.S. at 687.  To satisfy the "prejudice prong," a petitioner must
show that "there is a reasonable probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 580 U.S. at 119.
"A reasonable probability is a probability sufficient to undermine confidence in the outcome" of

the proceedings. *Strickland*, 466 U.S. at 687; *see Thornell v. Jones*, 602 U.S. 154, 155 (2024) (death penalty case).

A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Strickland*, 466 U.S. at 696. Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

In evaluating whether the petitioner has satisfied the two-pronged test set forth in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

## A. Ground One

In Ground One, Benson contends that his trial counsel was ineffective in three ways: failing to object to Detective Austin's hearsay testimony that Benson said, "I've got your back;" failing to cross-examine Andrew Washam on his testimony from Derrick Thompson's trial; and failing to object to improper remarks from the state during closing argument. ECF No. 5 at 28.

### (i) Failure to Object to Detective Austin's Hearsay Testimony

One of the contested facts at Benson's trial was who made the statement, "run him the fuck over," during the attack on Mr. Bergling. Andrew Washam, who pled guilty to conspiracy to commit first-degree assault and testified for the state under the terms of a plea agreement, testified that Benson made the statement during the first attack on Mr. Bergling. ECF No. 10-6 at

36-38, 26. Washam denied on cross-examination that he told lead investigator, Detective Austin, that it was Derrick Thompson who made the statement. *Id.* at 43.

Detective Jack Austin also testified as a state's witness at Benson's trial. ECF No. 10-6 at 133-169. He testified that he interviewed Washam on August 16, 2012, and Washam identified Benson as one of the perpetrators of the attack on Mr. Bergling. *Id.* at 142-143. On cross-examination, Detective Austin admitted that Washam told him that it was Derrick Thompson who said, "run the man over." *Id.* at 166. On re-direct, the following exchange occurred:

| ATTORNEY WIDDER: | Yes, Your Honor. want to clarify the statement that Mr. Washam made to you on August 23rd, 2012, about running Mr. Bergling over? What did he say to you? |
|---|---|
| DETECTIVE AUSTIN: | He said that it was Derrick Thompson that was yelling, "Run him over," and that Mr. Benson was encouraging him to do that. |
| ATTORNEY WIDDER: | What do you mean by that? |
| DETECTIVE AUSTIN: | Like, "I got your back, got your back." He was telling him, "I got your back." So, Mr. Thompson is saying, "Run him over," and Mr. Benson is saying, "I got your back." You know? |

*Id.* at 168.

Benson contends that his trial counsel was ineffective for failing to object to Detective Austin's testimony on redirect examination because it was impermissible hearsay that was highly prejudicial because it provided evidence of intent to kill with premeditation. ECF No. 5 at 28-41.

Benson made the same argument in his postconviction petition. ECF No. 10-1 at 191, 203-207. His trial counsel, Kimberly Righter, testified at the postconviction hearing (ECF No. 10-9 at 12-76) where she provided an explanation for failing to object to Detective Austin's testimony on redirect examination:

… In terms of it being an improper question, in my opinion, at the time, I looked at myself as having opened the door, because I asked him, what did Washam tell you about this specifically when I was impeaching. And it was just him asking, in essence, the same question that I had, "What had Washam told you?" Because I had been impeaching him with the Derrick Thompson statement.

ECF No. 10-9 at 15. The postconviction court denied Benson's claim, concluding that Detective Austin's testimony was inadmissible hearsay, but counsel was not deficient because it was her strategy not to object and Benson was not prejudiced. ECF No. 10-1 at 424-425.

The parties spend some time in their briefs discussing whether Righter was correct in her assessment that she had "opened the door" to Detective Austin's testimony. ECF No. 10 at 34-37; ECF No. 11 at 3-4, 6. But Benson's claim does not hinge on this question because the record demonstrates that he was not prejudiced by his trial counsel's failure to object.

Benson argues that his counsel was ineffective for not objecting to Detective Austin's hearsay statement on redirect examination because it established the *mens rea* element for attempted murder. Yet, this was not the only evidence introduced at trial from which the jury could conclude that Benson had the intent to kill. John Bergling testified that he was brutally attacked, robbed, and stripped of his clothing. ECF No. 10-5 at 158-170. Mr. Bergling testified that his attackers did not leave once they successfully took everything Mr. Bergling had in his possession, including his wedding ring, cell phone, and van. *Id.* They stalked Mr. Bergling through the neighborhood and attacked him two more times. *Id.* at 170-180. The jury could have inferred from the nature and duration of the attack that Benson and the other attackers had an intent to kill Mr. Bergling even if Detective Austin had never testified to Thompson's hearsay statement on redirect examination.

Benson cannot demonstrate that he was prejudiced by his trial counsel's failure to object to Detective Austin's testimony. The state court's dismissal of this claim was not an unreasonable application of *Strickland* and it is dismissed for lack of merit.

**(ii)    Failure to Cross-Examine Washam on Testimony from Thompson's Trial**

Benson contends that his trial counsel was ineffective for failing to cross-examine Andrew Washam on his testimony from the trial of Derrick Thompson. ECF No. 5 at 33-34. Washam testified at Benson's trial pursuant to a plea agreement with the state in which he plead guilty to the charge of conspiracy to commit first-degree assault in exchange for his trial testimony and a sentence range of eighteen months to seven years. ECF No. 10-6 at 36-37. Washam testified at Benson's trial:

> ATTORNEY WIDDER:    Okay, and want to be clear, it was Greg, Derrick, and Jerrod standing around the man, talking about robbing him and taking his belongings, is that true?

| ANDREW WASHAM: | Yes. |
| ATTORNEY WIDDER: | What happens next? |
| ANDREW WASHAM: | Jerrod said, "Run him the fuck over." And when got in the car, got in the car backed it up and drove it out of the neighborhood, on the side of the street. |

*Id.* at 27.

On cross-examination, Benson's trial counsel confronted Washam with his statement to Detective Austin that it was Derrick Thompson, and not Benson, that said, "run the man down." *Id.* at 42-43. Washam denied the statement. *Id.* at 43. Benson now contends that his trial counsel should have also confronted Washam with his testimony at Derrick Thompson's trial:

| STATE'S ATTORNEY WIDDER: | Okay. What happened next? |
| ANDREW WASHAM: | Someone yelled out, run him the fuck over. |
| STATE'S ATTORNEY W1DDER: | Do you know who that was? |
| ANDREW WASHAM: | I believe it was Jerrod. |
| STATE'S ATTORNEY WIDDER: | What makes you think it was Jerrod? |
| ANDREW WASHAM: | Because his voice...the voice I heard. |
| STATE'S ATTORNEY WIDDER: | And, had you recognized...well, was Jerrod the person you knew the longest? |
| ANDREW WASHAM: | Yes. |

ECF No. 10-1 at 263.

At the postconviction hearing, Benson's trial counsel, Kimberly Righter, testified that she intentionally confronted Washam only with his prior inconsistent statement to Detective Austin because Washam gave Detective Austin Derrick Thompson's name. ECF No. 10-9 at 48. The postconviction court concluded that Benson's trial counsel was not ineffective because she made a strategic decision to stick with impeaching Washam solely with his statement to Detective Austin. ECF No. 10-1 at 422-424.

Benson cannot demonstrate that his trial counsel's strategy was deficient performance. He argues that confronting Washam with his testimony from Derrick Thompson's trial would have been a more successful trial strategy, but *Strickland* requires a federal habeas court, when assessing counsel's performance to be "highly deferential." *Strickland*, 466 U.S. at 689; *Meyer v. Branker*, 506 F.3d 358, 371 (4th Cir. 2007) ("It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). This standard is "necessary to avoid second-guessing of 'perfectly reasonable judgments,' and to 'eliminate the distorting effects of hindsight' after an adverse decision." *Id.* (citing *Strickland,* 466 U.S. at 689).

Benson's trial counsel made a strategic decision to impeach Washam with the inconsistent statement to Detective Austin. This was sound strategy. The jury could have perceived Washam's testimony from Derrick Thompson's trial as corroborating his testimony that it was Benson, and not Thompson, that made the exculpatory statement. In any event, *Strickland* requires deference both to trial counsel's strategic decisions and to the postconviction court's conclusion that her performance was not deficient. The postconviction court's dismissal of this part of Ground One was not an unreasonable application of *Strickland* and it is dismissed for lack of merit.

### (iii)    Failure to Object During Closing Argument

Benson next argues that his counsel was ineffective for failing to object during the state's closing argument. ECF No. 5 at 34-36. Particularly, Benson contends that the prosecutor provided an inaccurate definition of "premeditation" when he argued:

> But premeditation doesn't have to be hours, it doesn't have to be minutes, it can be moment, moment of, "Hey, should be doing this?" And the Defendant had ample, ample, ample time to go, "This is not for me. don't want to be part of this anymore."

ECF No. 10-6 at 259. Benson also contends that his counsel should have objected when the prosecutor said:

> You are not to vote based on how you feel, you are to vote based on what the evidence says, because as prosecutor representative of the State, as jurors, people who are here to decide this case, we have somewhat of similar job. Our job is to look at the evidence impartially, coldly, and go exactly where it takes us.

*Id.* at 281.

The postconviction court found that neither comment was improper. ECF No. 10-1 at 425-426, 428. It found that the prosecutor's comment about premeditation was a proper example of the concept (*id.* at 426) and the comment about impartiality was not improper vouching but encouraging the jury to decide the case based on the evidence. *Id.* at 428.

The postconviction court found that the prosecutor's comment about premeditation was not a misstatement of Maryland law. This Court is bound by that conclusion. *See Bradshaw v. Richey,* 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law ... binds a federal court sitting in habeas corpus."). In any event, a prosecutor's improper comments will be held to violate the Constitution only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). Benson has not identified how the prosecutor's comment, which the postconviction court determined was a proper example of the law, denied him due process.

Nor has Benson identified how the prosecutor's comment about "impartiality" "so infected [his] trial with unfairness" to deny him due process. *Darden*, 477 U.S. at 181. Benson characterizes the statement as "vouching" (ECF No. 5 at 36) but the prosecutor did not suggest that he knew something personally that bolstered the credibility of the state's case. *See United States v. Sanchez,* 118 F.3d 192, 198 (4th Cir. 1997) ("Vouching occurs when a prosecutor indicates a personal belief in the credibility or honesty of a witness…"). Again, Benson fails to show how the prosecutor's single comment directing the jury to act with impartiality rendered his trial fundamentally unfair.

This part of Ground One is without merit and is dismissed.

**B.      Failure to File Motion for Three-Judge Panel**

In Ground Two, Benson contends that his counsel was ineffective for failing to file an application to have his sentence reviewed by a three-judge panel pursuant to Maryland Rule § 8-102. ECF No. 5 at 41-47. Respondent argues that Ground Two is non-cognizable in federal habeas review. ECF No. 10 at 76-83. The Court agrees.

Habeas relief is only available for "custody in violation of the Constitution or laws or treatises of the United States." 28 U.S.C. § 2254. Benson's custody does not stem from his counsel's alleged deficiencies in connection with the three-judge panel process. Indeed, an application for a three-judge panel is collateral review in Maryland. *See Wall v. Kholi*, 562 U.S.

545 (2011) (finding that a motion for discretionary sentence reduction is collateral review). And, 28 U.S.C. § 2254(i) specifically prohibits habeas relief from claims of ineffective assistance of counsel in postconviction collateral review proceedings.

Ground Two is dismissed as non-cognizable in federal habeas review.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Because the accompanying Order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability before an appeal can proceed.

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Benson has not made the requisite showing. Accordingly, the Court declines to issue a certificate of appealability. Benson may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003).

## V.    CONCLUSION

For the foregoing reasons, the Court will deny Benson's Petition for Writ of Habeas Corpus. A separate Order follows.

July 30, 2025
Date

LYDIA KAY GRIGGSBY
United States District Judge